OF THE

## STATE OF NEVADA,

### JULY TERM, 1869.

---

## IN THE MATTER OF THE ESTATE OF MARCO MIL-LENOVICH, Deceased, No. 1, Legatees Appellants.

5 161
5 189
17 183
30* 828

ACCOUNTABILITY OF EXECUTORS AND ADMINISTRATORS. While the law closely scrutinizes the acts of executors and administrators, and requires the utmost good faith from them in all their transactions with or on behalf of the estate, it does not require infallibility of judgment nor rigorous accountability for any mishap which may occur during the administration.

LIABILITY OF EXECUTORS FOR LOSSES. If an executor, in the conscientious and judicious discharge of his duty, sustains a loss by reason of unfortunate circumstances, and not by reason of any violation of a positive requirement of law, he should not be held to strict personal account for such loss.

POSITIVE LAW MUST BE STRICTLY FOLLOWED BY EXECUTORS. When the law has clearly pointed out a certain course to be pursued by executors, that course must be strictly followed; and if they disregard it they should be held to answer for any loss which the estate may suffer thereby, notwithstanding they may have been actuated by the best of motives.

ACTS OF EXECUTORS IN GOOD FAITH WITHOUT ORDER OF COURT. If an executor should in good faith do an act without an order of Court, which the law declares shall not be done without such order, and if the act be one which the Court would have approved or ordered done, and no injury has resulted from his action, he should not be chargeable with mismanagement of the estate.

In the Matter of the Estate of Marco Millenovich.

SETTLEMENT OF ACCOUNTS OF EXECUTORS—IRREGULARITIES IN PROCEEDINGS. Irregularities in probate proceedings, which have not been prejudicial to the estate, should not influence the Court in the settlement of accounts, the main inquiry in such cases being whether the amounts charged are just and legal claims against the estate, and whether the executor has managed its affairs with good faith and ordinary prudence.

OBJECTIONS TO APPRAISERS NOT VALID OBJECTIONS TO EXECUTORS' ACCOUNTS. That the appraisers of an estate were not disinterested parties, as by statute they are required to be, is no reason why the just accounts of the executor should not be settled and allowed.

CHARGES FOR REPAIRS MADE BY EXECUTORS. If an executor be authorized to make repairs to the property of his testator's estate, and in so doing expend somewhat more than the real value of the improvements, yet if it appear that he acted in good faith, and exercised ordinary discretion and circumspection in the matter, an order of the Court below allowing the charge will not be disturbed on appeal.

LEASES BY EXECUTORS. If an executor lease property belonging to the estate represented by him, it does not follow that he should lease to those who offer to pay the highest rent; the purposes for which the property is to be used, the responsibility of the lessee, the length of time for which he may agree to lease, and many other circumstances of the kind, must be taken into consideration.

FUNERAL EXPENSES. In the settlement of executors' accounts for funeral expenses, all the circumstances of the case should be taken into consideration, and their accounts allowed, if they have acted with ordinary prudence and with a regard for decency and respectability, according to the condition in life of the deceased.

EXPENSES OF LAST SICKNESS. If the charges allowed and paid by an executor for the expenses of the last sickness of his testator, though apparently extravagant, are no more than the usual charges for like services at the time, an order approving his account of them will not be disturbed on appeal.

EXECUTORS INTERESTED IN PURCHASES FROM ESTATE. Though the statute prohibits executors from being interested in the purchase of the property of the estate, yet if such a purchase be made, the Court may affirm it, the only consideration in such case being the interest of the estate.

PURCHASE BY EXECUTOR AFTER ESTATE CEASES TO HAVE INTEREST. There is nothing in the probate law to prohibit an executor from becoming interested in property of the estate of his testator after the estate has ceased to have any interest in it.

DESPERATE CLAIMS DUE ESTATES OF DECEASED PERSONS. An executor or administrator should make all reasonable effort to collect all claims due the estate, but he should not involve it in litigation for claims which in his judgment cannot be collected; and if such claims have no value attached to them in the inventory, it will require clear proof of loss through his carelessness or want of attention to charge him with the amount of them.

MINING STOCKS OF DECEASED PERSONS. Mining stocks belonging to the estate of a deceased person, which are only an expense to it, should be disposed of,

In the Matter of the Estate of Marco Millenovich.

unless it be quite evident that it would be for the interest of the estate to hold them.

PAYMENT OF ASSESSMENTS ON MINING STOCKS BY EXECUTORS. It is within the jurisdiction of the Probate Court to order payment of assessments legally levied upon mining stocks belonging to the estate of a deceased person; and if the executor act in obedience to such order, it would be inequitable to charge him personally with payments so made, or refuse to allow them as just payments made for the estate.

LOSS OF RECORDS—NEGLECT OF CLERKS' TO ENTER ORDERS. Where, on a contested settlement of the accounts of an executor, he claimed that he had paid certain assessments on mining stocks under an order of the Probate Court directing him to do so, and the order did not appear to have been entered on the minute book of the Court, and could not be found among the papers on file, but the attorney for the executor testified that it had been duly made, and that he had seen it among the papers of the Court after the contest had arisen, and that no assessments were paid until after the making of the order: Held, that the neglect of the clerk to enter the order, or its loss, could in no way affect the rights of the executor, nor render the order less effective as a protection to him.

SECONDARY EVIDENCE OF LOST JUDICIAL RECORDS. Where an order of the Probate Court, necessary as an authorization to justify the acts of an executor, is lost, secondary evidence of its character is allowable.

LUCICH v. MEDIN, (3 Nev. 93) to the effect that a decree of settlement of the accounts of an executor or administrator closed all further investigation in respect to all accounts allowed, except where some error or mistake appeared upon the record, approved.

EXPENSES OF CONTESTS BETWEEN EXECUTORS. The expenses incurred in a controversy between executors, one opposing the qualification of the others, are not just or proper charges against the estate.

ILLEGAL CLAIMS AGAINST ESTATES PARTLY PAID. The fact that part of an illegal claim against the estate of a deceased person has been paid and allowed in a previous account of the executor, is no reason why the balance should be allowed on a subsequent account.

EXECUTORS COMPETENT WITNESSES ON THEIR OWN BEHALF. An executor is not within the exception of the Act excluding persons as witnesses on their own behalf, where the opposite party is the representative of a deceased person, etc. (Stats. 1864–5, 77.)

COSTS ON CONTESTED SETTLEMENT OF EXECUTOR'S ACCOUNTS. Where, in a contest as to the settlement of the accounts of an executor, the Court below deducted a considerable sum, and then allowed the balance of the accounts: Held, that the contestants were entitled to their costs.

CONSTRUCTION OF SECTION THREE HUNDRED AND ELEVEN OF PRACTICE ACT. Section three hundred and eleven of the Practice Act does not conflict with Section four hundred and forty-one of the same, which allows costs to the contestants of an executor's accounts as the prevailing parties, when they succeed in reducing the amounts allowed on settlement.

In the Matter of the Estate of Marco Millenovich.

APPEAL from the District Court of the First Judicial District, Storey County.

Marco Millenovich, the deceased, was a saloon keeper, doing business at the " San Francisco Saloon " in Virginia City, in partnership with Marco Medin and Luco Zenovich—he being interested to the extent of one-half and they to the extent of one fourth each. On July 4th, 1863, in a difficulty which occurred at the saloon, he received a mortal wound, of which he died some ten days afterwards, leaving a will, and appointing therein Marco Medin and Vincent Millatovich his executors. Soon after his death, Medin qualified as executor and entered upon the discharge of his duties as such. Millatovich at first declined to accept the trust of coëxecutor, but afterwards did apply for letters, and they were issued to him, though his claims were opposed by Medin, on the ground of want of qualification. But notwithstanding his appointment as coëxecutor, it appears that Medin had the exclusive control and management of the estate.

Marco Medin, as executor, filed his first account on February 13th, 1864, and a second one on February 12th, 1865, which were strenuously contested by Andriana Lucich and others, the legatees under the will, and were passed upon by the Court below. From the decree thereon an appeal was taken, the decision upon which will be found reported under the title of *Lucich* v. *Medin*, in 3 Nev. 93.

There was subsequently, on November 23d, 1867, a final account filed, to which the legatees interposed a great number of objections, sixty-three in all, the principal of which, and all that were specially urged by counsel, are stated in the following opinion. The decree of the Court below allowed the final account with some modifications and exceptions; and from this decree there were two appeals—this one by the legatees, and another by the executor, which will be found reported as the next case.

*C. E. DeLong* and *P. O. Hundley*, for the Legatees Appellants.

I.   The estimate of the value of improvements to the San Francisco Saloon, made by McKay and others, was made upon all the

In the Matter of the Estate of Marco Millenovich.

improvements on the premises, and is a liberal one—as McKay, in his testimony, says he was directed to make. It was made upon each item, by actual measurement and count, and by men experienced in that business, who were engaged at their trade in this place at the time the improvements were made, fully up in the prices of labor and lumber, and yet they cannot make it reach the sum charged by the executor. Why, then, should a greater sum than their estimate be allowed ?

According to the best estimate that we can make on the improvements, and allowing the most liberal prices for labor and materials, and taking a part of the executor's own account rendered, we show that the estate has paid two hundred and twenty dollars and sixty-seven cents more than its due proportion of the expenses for improvements.

II. There were a number of persons who were desirous of renting the San Francisco Saloon, and procuring the good will of the business after the death of Millenovich. Applications were made to rent it. Finally, in August, 1863, Medin for himself, Mark Lovely, and Spiro Vucovich, agreed with N. Millatovich to take it for six months, at six hundred dollars per month. It could, according to the testimony, have been rented readily at six hundred dollars per month, for from six months to a year, to other parties. Medin has accounted for three months at six hundred dollars, and for the remaining three months at only four hundred dollars. He should be held for the proportional part of the difference belonging to the estate.

The executor should be charged with what the property could have been rented for ; but owing to partiality or favor shown to himself and others, he failed to receive the amount that the property was reasonably worth. For if he could receive more for the property, and failed to take it, it was clearly his fault, and he is certainly chargeable with the difference between what he received and that which he could have received. An executor has no right to be generous with the property of his testator, especially so when the drift of that generosity is to his own advantage.

III. The funeral expenses were to a great extent unnecessary, extravagant, and prodigal. The aggregate amount charged by the

executor, is the sum of one thousand three hundred and twenty-five dollars and twenty-six cents. The first item is the transportation of the body of the deceased to San Francisco, charged at three hundred and eight dollars and fifty cents. We think there should be deducted from this the sum of two hundred and eight dollars and fifty cents. Why an executor would ship a body, by private conveyance, at a cost of over three times as much as he could have shipped it by one of the express companies, is strange and unaccountable. He could have had it landed in San Francisco for the sum of one hundred dollars, and the other expenses should not have been over four hundred dollars; this would have made five hundred dollars in all, which, deducted from the one thousand three hundred and twenty-five dollars and twenty-six cents, leaves the handsome sum of eight hundred and twenty-five dollars and twenty-six cents to have erected a monument or laid a stone to mark the resting place of the deceased. The medical bill is most extravagant; for an illness of ten days, amounting to nine hundred and twenty dollars, nearly one hundred dollars per day. These bills having been paid without any order of Court, the executor has paid them at his peril. This is the first time the heirs have had an opportunity of contesting them, and we may well ask, would any Court or Jury give that sum for medical services performed for the deceased? We think not.

IV. At the death of the testator, the firm of Millenovich & Co. was doing a splendid business, of about seventeen hundred dollars per month, as the account of sales show from the first to the fifteenth day of July, A.D. 1863. The stand was well and favorably known; the stock of liquors on hand was large, of good quality, and well suited to the business; and the purchase of so complete a stock and fixtures in connection with the good will of the business was desirable, and no one appreciated this condition of things more than did Medin and Lovely; they who, in connection with Spiro Vucovich, purchased them of Medin, as executor, for the benefit of their new firm.

No executor can directly or indirectly purchase any property of the estate which he represents. (Stats. 1861, 219, Sec. 195; *Ogden* v. *Astor*, 4 Sandford, 349; *Devine* v. *Fanning*, 2 Johns.

Ch. 255; *Monroe* v. *Allaire*, 2 Caines' Cases, 191; *Wormley* v. *Wormley*, 8 Wheat. Cond. Rep. 480; *Zilkin* v. *Carhart*, 3 Bedford, 376; *Case* v. *Able*, 1 Paige's Ch. 397, and note.)

If an executor cannot purchase from his coëxecutor without rendering himself liable for profits, he certainly must when he purchases from himself. But as the executor and his partners kept no books, it is impossible in this case to ascertain the exact profit. In such cases it has been usual to impose interest upon the executor for the amount of the purchase from the estate. Or, to take another view of the matter, it must be apparent from the evidence and authorities above cited that the stock of liquors, fixtures, and the good will of that business, was worth more than cost and freight. The same quantity and quality of articles could not be placed in that saloon for the money for which they were sold. There must of necessity be leakage, commission, breakage, and other incidents of expense, whether the goods were ordered from below, or whether the parties went after them. In either event, these expenses would fall on the purchaser; the vendor certainly would not pay and bear this loss. And taking the wholesale price at this place, not that at San Francisco as the standard, the price of the articles sold would be greatly enhanced above what they have been returned by the executor.

V. The executor has failed to account for property that belonged to the estate, and that came into his hands; among which is a safe, furniture, and clothes, belonging to deceased at the time of his death; blankets, bedding, and bedstead, worth in all about two hundred and fifty dollars. These things having been shown to have been in the possession of the testator at the time of his death, and in the care and custody of the executor, he must show what he has done with them, or else they must be charged up to him.

VI. The executor returns in his inventory the sum of about three thousand seven hundred dollars for debts due the estate, and only the sum of five hundred and twenty dollars collected. What exertion has been made by the executor to collect the sums due to his testator? The law makes it imperative upon him to use the utmost diligence in collecting the debts due to the deceased, and if he fails to use this diligence, what follows? That he is responsible

or accountable to the estate for all debts that remain uncollected by his fault.   Do they not remain uncollected by his fault, if he uses no effort to collect them ?   If such is not the case, then the failure of an executor to do his duty is not negligence or a breach of trust.   To escape responsibility, the executor must show that the debtors are insolvent, or at least must show a demand on the debtors and a refusal on their part to pay.   (*Shultz* v. *Pulver*, 3 Paige's Ch. 183 ; 2 Williams on Ex. 1636, 1637, note *e*.)

The executor in this case has not shown a demand upon, or a refusal of a single debtor to pay the amount due the estate, or that any of said debtors were insolvent, or unable to pay the amount due the estate.   Would any prudent man in the management of his own concerns have been so remiss in his duty, and so neglect his own concerns ?   Certainly, less diligence and attention can in no instance be indulged in to an administrator ; and the course of the decisions would seem to exact a greater activity and devotion of executors, etc., in the execution of their trust.

Counsel for the executor seemed to intimate that the heirs or their agent had the right to collect these debts.   This we deny, and say no authority can be produced to substantiate that position.

VII.   In relation to the order said to have been made by the Probate Court " to pay all assessments due, and to become due." We maintain that the Court, being under the territorial government of inferior and limited jurisdiction, had no power or authority to make an order for the payment of assessments on mining stocks. The assessments on mining stocks was not a claim against the estate ; the company could not sue the executor for the assessments on stocks belonging to the estate in case he refused to pay them ; the remedy given by statute to the company was to sell the stock—they had no claim against the estate.   The Court could with as much propriety have ordered the executor to borrow money, or pay the money on hand belonging to the estate to some charitable institution, as to have ordered the executor to pay all assessments on mining stocks due or to become due.

But we assert that no such order was ever made by the Probate Court.   The only evidence of the existence of any such order is that of an attorney.   Against his testimony stands the records of

the Court, the testimony of witnesses familiar with the papers, that they never saw any such order among the papers, and the fact that no such order was produced or even suggested when this cause was tried before, and it was important, if such an order existed, to have produced it.   Not a paper can be found on file leading to the making of such an order, and if the Court had the power it is not to be presumed that it would make it upon the mere verbal sugges- tion of counsel.   The question, then, resolves itself into this : Had the executor a right to pay these assessments upon his own motion ? We say he had not.   What power does an executor possess other than those given him by statute ?   Is not that the measure and limit of his authority as to what he shall and shall not do ?   The executor cannot say he did thus and so in good faith and possibly for the benefit of the estate ; his powers and duties are not measured by good intentions ; if so, he might engage in any specu- lation that his judgment would satisfy him, and would be beneficial to the estate ; and would the plea of good faith, or good intentions restore the estate to the heirs and absolve him from all account- ability ?   Surely not.

Where the executor undertakes to go beyond the strict line of his duty as the law defines it, he acts upon his own responsibility ; and while he can receive no profit from a successful use of his in- vestment, he must bear the loss of a failure.   (*Estate of Knight*, 12 Cal. 207 ; *Tompkins* v. *Weeks*, 26 Cal. 59.)

It appears in this case that the executor has taken the money, received from the sale of personal property, rents of real estate, and cash on hand at the death of deceased, and applied it (amount- ing in the aggregate to the sum of four thousand nine hundred and ninety-two dollars and fifty cents) to the payment of assessments on mining stocks that are valueless.

This Court, when this case was previously before it, both in the original opinion delivered and in that upon petition for a rehearing, said expressly, that the executor was guilty of an unlawful act, if he borrowed money for the estate unless authorized by will.   If it were unlawful to borrow money to pay a legal charge, it certainly was unlawful to pay an illegal charge against the estate ; and if he could not borrow money for either a legal or illegal purpose he

12

could not legally contract to pay interest on money thus illegally obtained.

Again: The executor sells stock without any authority so to do, when there is no necessity for it, and refuses to apply for an order, and prosecute it, to sell the stock, where there is, according to his statement, an urgent necessity therefor. He exhausts the funds of the estate by paying heavy assessments, and winds up by selling the Uncle Sam stock only, at a sacrifice, and retaining the other stocks until they are worthless, making no effort, so far as disclosed by the testimony, to convert them into money for the benefit of the estate.

Such being the status of the Uncle Sam stock, the executor is chargeable with the appraised value in the inventory; and if the Court finds from the evidence that it was of any greater value than the sum at which it was appraised at any time before or after the executor disposed of it, he should be required to account for it at such value. (1 Bouvier's Law Dic., word "Devastavit," and authorities there cited.)

VIII. We claim that none of the items of this account, though contained in a former account, have been legally adjudicated and settled. This Court having required the executor to file an account making a full showing of all property and assets that have come to his hands, up to the time of filing such account, ignores all former statements, and requires the executor to have a new accounting. This shows that the former accounts were not correct; that he had not accounted for all the property and assets received by him; for if the other accounts were correct and had been properly adjudicated, upon what principle could the Court ask for a new accounting? The object was to open up the whole matter for a new and further investigation, to be determined by the weight of evidence adduced upon the trial and the *settlement of the accounts as filed.*

Again: The balance paid Aud & Beebe appears as the first item in the third and final account, and specifies particularly what it was for; to wit: " Cash paid Aud & Beebe, bal. in full for professional services in matter of application of Vincent Millatovich for letters testamentary as coëxecutor, three hundred and seventy-five dol-

In the Matter of the Estate of Marco Millenovich.

lars." This amount was not a charge against the estate, and should not have been paid by the executor. And the same is true of bill of fifteen dollars paid William H. Davenport for taking affidavits of claims against the estate. Each claimant is required to present his or her claims against the estate with proper vouchers, and in that form to be allowed or rejected by the executor; the estate is not required to pay for the affidavits to claims; that is the duty of the claimants themselves.

. IX. We have examined all three of the accounts presented for settlement, as to the amount of expenditures for which there are no vouchers, and find it to be one thousand six hundred and sixty-six dollars and ninety-five cents. The statute is imperative that every executor or administrator, in rendering his accounts, " shall produce vouchers for all charges and expenses which he shall have paid." (Stats. 1861, 224, Secs. 233, 234; *Wilcox* v. *Smith*, 26 Barb. 341.) It only allows the oath of the administrator or executor without vouchers to items under twenty dollars, and that is limited to the sum of five hundred dollars. It is certainly against the letter and spirit of the statute to allow the executor to testify as to expenditures which he has paid, where the same is over twenty dollars. And we here assert that Medin was not a competent witness for himself on the trial of the matters contested by the heirs, and for the proof of his position refer to the following authorities: (Stats. 1864, 77, Sec. 13; *Wilcox* v. *Smith*, 26 Barb. 344, and authorities cited; *Roney* v. *Buckland*, 4 Nev. 45.)

The real contest in this matter was between Medin as executor on the one side and the estate of the deceased on the other; a settlement of his accounts with the estate, with what expenditures paid by him he should be credited, and to what amount the estate was entitled to charge him for property and moneys received by him as executor. Therefore the testimony of Medin should be stricken from the record. Upon a just and proper accounting in this matter, the executor will be found indebted to the estate in the sum of over eight thousand dollars and a fraction.

*R. S. Mesick* and *Williams & Bixler*, for Executor, Respondent.

I. In adjusting the accounts of executors Courts are governed

by principles of equity as well as of law; and it is at all times competent for an executor in such a proceeding, like as in a pure equity proceeding, unimpeded by technical rules, to show the fairness of his dealings, the real nature of his transactions, and the amount for which he should, in fact, be held liable. (*Upson* v. *Badeau*, 3 Bradf. 13.) And therefore this Court will be governed by the well-established rule that things done without application to the Court which would have been ordered to be done on application, will always be sanctioned by the Court. (Hill on Trustees, 853; 1 U. S. Eq. Dig. 487, § 214.) And also by the rule that an executor is not chargeable with a loss, when he has managed as a prudent man would have managed his own affairs. (1 U. S. Eq. Dig., 495, §§ 392 and 394; *Christy* v. *McBride*, 1 Scammon, 75.)

Creditors may question successfully the proceedings and outlays of an executor when heirs and legatees cannot. As to creditors, the outlays must be necessary; as to heirs and legatees, they may be liberal. As to creditors, the executor must convert the property into cash; as to heirs and legatees, it is his duty simply to preserve it. (*Hancock* v. *Padmon*, 20 E. C. L. 382; *Verner's Estate*, 6 Watts, 253.)

As to the charge of three hundred and eight dollars and fifty cents for the transportation of the body of deceased by Mullaney from Virginia City to California, we say it cannot appear exorbitant without the evidence, and the evidence shows that the amount is not excessive. There were but two ways of moving the body: one by public conveyance, the other by private conveyance. Can any Court say that the friends of the deceased acted wrong in choosing either mode of conveyance, rather than the other? Or can the Court say even under the proofs that the mode of conveyance selected in this case was not proper, or even that it was not the only practicable one? There was no proof of any public conveyance by which the body could be moved, leaving this place oftener than once a week, and none that the body could have been moved at the proper time by such conveyance. Moreover, while it may appear that the body might as safely have been moved by the cheaper mode of conveyance as by the other, and while the wishes of friends

whose duty it was to see the deceased decently buried, to have him transported by private rather than public conveyance, might seem a matter of mere pride or sentiment, can the Court say that such feelings and wishes are not to be respected and gratified even at a little loss to the heirs and legatees ?  If not, why shall an executor pay the greater expenses of transporting a dead body from the deathbed to the grave by means of a hearse rather than a dray, and why not bury him in his old clothes to save the new ones for his devisees ?

We submit upon this item that prudence, economy, and decency, required the executor to pay, and not contest the item.

II.  In relation to the assessments on mining stocks, it was admitted on the trial that the amount of the assessments was actually levied, and the money actually paid ; that if it had not been paid, the stock would have been sold at assessment sale, and that the stock was worth more than the assessment levied upon it, at the time of the payment.  It is contended that the law conferred no authority upon the executor to make these payments, and that he made them without having first obtained the authority of the Probate Court so to do.  Our reply is, that the law did invest the executor with authority to make these payments under the circumstances, and not only so, but made it his duty so to do.  It was the duty of the executor to preserve the estate from being sacrificed, or sold for any legal impositions either of taxes or assessments, where it was in danger.  He might as well omit the payment of taxes, as assessments on personal property.  (*Reily* v. *Sampson*, 10 Pick. 373 ; *Cutler* v. *Middlesex Factory Company*, 14 Pick. 484.)

As to the order made by the Probate Court, there is the positive evidence of the attorney of the executor in the estate, that such order was obtained by him before the payment of any of the assessments, and also the evidence of Medin that he was directed by the attorney not to pay any of the assessments until the latter had obtained such an order for their payment, and that he paid them only after he was advised by the attorney that he had obtained the order for the payment of all assessments on mining stocks belonging to the estate, due and to become due.

III.  The Court upon the trial expressed its satisfaction as to the

account for improvements and repairs.    The proofs show that there was expended for those improvements and repairs a much larger proportional sum than that charged against the estate ; and it is certain from the proofs that the executor, with the other joint owners, paid out for these improvements all the money which is charged in this account and more ; and no one can say that it was not paid out fairly and in good faith.

Had the charges not been reasonable, it is not likely that the other owners, who were on the ground and knew all about it, would have paid their share, which they did without objection.

IV.    The claims of Spiller, Devens, and McMeans, each for fifty dollars, and of Echler for sixty dollars, of Gautier for one hundred dollars, and of Bryant for five hundred dollars, for medicine and surgical attendance upon deceased, were all expenses of the last sickness, directed by the statute to be first paid, and were so paid as allowed by the Probate Judge and the executor.    It would seem that the deceased, during his last illness, was as much interested in and entitled to decide the question as to what expense he should go to in procuring assistance to save his own life as are now the devisees.    The executor paid the claims in good faith, and there is no evidence now that the payment of the last dollar of any one of them could have been successfully resisted.

V.    As to the question of rents, the Court must see that a prudent man must look at various things in choosing a tenant and fixing the amount of rent.    Can it say that the owners of this property acted unbusiness-like and imprudently, not only as to the interests of the estate, but as to their own interests in its management ?    One thing is certain and is admitted—that the property has been so managed, that while almost everywhere else in the city rents and values have declined to almost nothing, this property has continued to pay a liberal rent, and is still counted the best in the city. This has been done by the business habits, the care and fidelity of the owners of the property, and the executor with whom so much fault is found.

The reduction of rent complained of diminished the amount of the executor's private revenue to a considerable extent, as well as it did that of Zenovich and of the estate.

It is plain that Medin got as good rents as anybody else who let his premises to responsible and permanent tenants, and who declined to have anything to do with mere adventurers.

VI.   As to the uncollected accounts, we insist that Medin has done all that his duty required.   The appraisers were unable to ascertain that these accounts were worth anything, and so put no value upon them, and yet several hundred dollars were realized out of them.   The truth is, as Medin says, that the devisees and their agent took charge of them, and did recover from parties sums of money, boots, and shoes, and other things, in satisfaction thereof.

Furthermore, under the circumstances of no value being placed upon those claims in the inventory, and of the testator himself considering them of doubtful value, the executor was not at liberty under the law to hazard the money of the estate in hand, in attempting to secure these doubtful claims, and especially it was not his duty to pursue them, except at the request of the legatees or devisees, and upon an indemnity against costs, neither of which ever existed.   (*Sanborn* v. *Goodhue, Ex'r*, 8 Foster, 48.)

VII.   As to the furniture amidst which the testator died, there is no proof that it ever came into the possession of the executor, and he can be held responsible only for what came into his possession.   Possibly, engrossed as he was in caring for the decent disposition of the testator's dead body, he may be excused for not having given special attention at once to the collection of these effects, which, under the circumstances, could have had but little value. There is no proof that the executor was in any default, or that these things were of any value whatever.   There is no proof but hearsay that the safe belonged to the deceased.

VIII.   As to the want of vouchers, we insist that the aggregate of all the items under twenty dollars for which there were no vouchers, does not exceed five hundred dollars.   Medin and Keeney both testified to the loss of many vouchers.

IX.   The question of admitting Medin to testify we supposed was settled on the trial, and not now open for discussion.

X.   Upon the matter of striking out the cost bill, we insist that the order was correct.   The matter of costs is addressed to the equitable discretion of the Court.   (Stats. 1861, 235, Sec. 296 ;

Stats. 1861, 237, Sec. 311.)    Considering the whole contest upon the accounts of the executor, he prevailed.    He was sustained in more than nineteen-twentieths of the items contested, whether we consider the written objections filed, and the proofs offered by the contestants together, or their proofs alone.    On an appeal from a decision upon an executor's or administrator's accounts—where the allowance of costs is matter of discretion with the Appellate Court—costs are not allowed the appellant, where the appellee prevails or is sustained as to any of the material items objected to, or where he substantially prevails.    In such case the rule of equity is applied.    (*Griswold* v. *Chandler*, 6 N. H.; *Wendell* v. *French*, 19 N. H. 205; 1 Foster, 203; 33 N. H. 104.    See also, *Eastburn* v. *Kirk*, 2 John. Ch. 317; *Harvey* v. *Chilton*, 11 Cal. 120; *Gray* v. *Dougherty*, 25 Cal. 266; *Scott* v. *Thorp*, 4 Edw. 1; *Johnson* v. *Taber*, 6 Seld. 319; *Righter* v. *Stall*, 3 Sandf. Ch. 428; *Beacham* v. *Eckford*, 2 Sandf. Ch. 116; *Ten Eyck* v. *Holmes*, 3 Sandf. Ch. 428; *Travis* v. *Waters*, 12 Johns. 500; *Minuse* v. *Cox*, 5 Johns.. Ch. 441.)

The allowance of costs, then, being a matter of discretion with the Court below, this Court has no power to review that discretion.    (*People, etc.* v. *The N. Y. Central R. R. Co.*, 29 N. Y. 418.)

*DeLong, Hundley*, and *J. W. Whitcher*, in reply.

By the Court, LEWIS, C. J.:

This matter comes before this Court upon an appeal from a decree of the District Court settling and allowing the final accounts of Marco Medin, the executor of Millenovich, deceased.    Upon the hearing in the Court below between the contestants and the executor, several items were stricken from the account; but it is claimed on behalf of the heirs that there are many others settled and allowed which should have been stricken out.    The objection to these items will be presently noticed, but it may be well to observe in the outset that whilst the law closely scrutinizes the acts of executors and administrators, and requires the utmost good faith from them in all their transactions with or on behalf of the estate, it

does not require infallibility of judgment, nor rigorous accountability for every mishap which may occur during the administration. When the law requires a thing to be done, and has not plainly marked out the manner in which it shall be performed, the executor or administrator is required to exercise not only the utmost good faith but also ordinary prudence and judgment in its execution. But when it has already pointed out a certain course to be pursued, that course must be strictly followed. If the executor in the conscientious and judicious discharge of his duty, sustains a loss by reason of unfortunate circumstances, and not by reason of any violation of a positive requirement of law, he should not be held to strict personal account for such loss. " If the administrator has acted for the benefit of the estate, used proper diligence, and acted with ordinary care and circumspection in the discharge of his trust, he ought not to be held answerable for the losses which could not have been foreseen, and which ordinary precaution could not guard against." (1 Scammon, 75.) In the discharge of fiduciary duties a person is not held accountable for those mischances which ordinary prudence could not have averted. But for the consequences of rashness, imprudence, or bad faith, he is held most rigorously answerable, for although the law is indulgent to those whose acts are guided by good motives and ordinary prudence, it abhors fraud, bad faith, and reckless imprudence.

Suppose, however, the law points out a certain course to be pursued by an executor or administrator, and that course is disregarded, what is to be the consequence? One thing is certain: he should be held to answer for any loss which the estate may suffer thereby. No plea of good faith, or the exercise of prudence, will avail him as a defense in such case against the claim of the estate for indemnity or accounting. If he disregard the law he is answerable for the consequences, notwithstanding he may have been actuated by the best of motives. We do not, however, wish to be understood as holding that every violation or disregard of some requirement of law will subject the executor to the imputation of mismanaging the estate, and so subject him to a deprivation of his just commissions or compensation for the services performed by him. If, for example, he should in good faith do an act without an order

of Court, which the law declares shall not be done without such order, and if the act were one which the Court would have approved or ordered done, and no injury has resulted from his action, he should not be chargeable with mismanagement of the estate. In every such case, however, the executor renders himself liable for any loss which may be sustained by reason of the irregularity of his proceeding. Nor should the Court always compel the executor to undo the act simply because it was done without an order previously obtained. The interest of the estate should alone be considered in such case. If it would be for its benefit to have the act of the executor set aside, that course should be pursued; but if not, it should be approved. "It is a rule in equity," says President King, in *Norris* v. *Fisher*, (2 Ashmead, 424) "that if an executor does without application what the Court would have approved on application, he should not be called to account and forced to undo that, merely because it was done without application." And this is a rule equally applicable in the Probate Court in every character of proceeding. It should, therefore, be borne in mind that irregularities which have not been prejudicial to the estate should in no wise influence the Court in the settlement of accounts. The main inquiries are generally, whether the accounts are just and legal claims against the estate, and whether the executor has managed its affairs with good faith and ordinary prudence. Beyond these it is generally unnecessary upon the settlement of accounts to extend investigation.

It is claimed by counsel for the heirs, however, that many of the items of the final account presented by the executor Medin are unjust and exorbitant, and that he is chargeable with gross mismanagement of the estate. And the first complaint made is, that the appraisers of the estate were not, as by statute they are required to be, disinterested parties. Whether they were or not is a question not necessary to be determined in this proceeding, for whether so or not, cannot affect the executor's right to have his just accounts settled and allowed. It was not the executor's duty, but the Court's, to select the appraisers. (Stats. 1861, 201, Sec. 108.) The failure on the part of the Court to appoint proper persons, certainly does not subject the executor to any imputation

of wrong. Hence, all that is said with respect to the appraisers being interested parties can have but little bearing upon the real questions to be determined by this Court. That the failure of the Court to appoint disinterested persons to act as appraisers, is no reason why the executor's account should not be settled and allowed, if just and correct, is a proposition almost self-evident. And another complete answer to what is said upon this point is, that the proof is satisfactory to us that the property sold was appraised at what it was worth, and sold for its full value in the market.

. The first item of expenditure in the account which is complained of is that for repairs upon certain buildings, and improvements of certain real estate, owned by the executor and the deceased in his lifetime as tenants in common. It does not seem to be claimed that the executor had not the right to make these improvements; and the only objection which is made to this item is that it is exorbitant. Whether it is so, is the only question to be decided by this Court. The sum of money expended for these purposes amounts, in the aggregate, to three thousand one hundred and forty-one dollars, and as the deceased was the owner of an undivided half only, but half of this sum (fifteen hundred and seventy dollars) is charged to the estate. It can hardly be doubted that this sum was paid by the executor for the improvements. But witnesses on behalf of the contestants, who made an estimate of the value of these improvements, testified that they should not have cost over about twenty-seven hundred dollars. The difference between this estimate and the amount expended by the executor was about four hundred and forty dollars on the entire improvements—or, two hundred and twenty dollars on the estate's proportion of the cost. From this item in the account, it is, therefore, contended, should be deducted two hundred and twenty dollars. This difference between the estimate and the amount charged in the account by the executor is certainly not very damaging to him, even if there were no testimony in support of the item; for it is well known that estimates of the costs of improvements of the character made by the executor are seldom anything more than an approximation to what is usually the real cost. Hence, we doubt

whether, if there were no testimony whatever on the part of the executor in opposition to that presented by the contestants, this item should be remedied. But the executor did produce testimony fully showing the sum paid by him for these improvements, and charged to the estate, to be moderate and reasonable; some of the witnesses estimating their value at thirty-eight hundred dollars. The testimony being thus conflicting, and the Court below having allowed the item as a just and legal charge against the estate, we would not feel justified in disturbing the decree, even if not entirely satisfied that it was correct. But the evidence fully satisfies us that the item is just and was properly allowed.

Even if it were satisfactorily shown that the executor paid two hundred and twenty dollars more than the real value of the improvements, if he acted in good faith and exercised ordinary discretion and circumspection in the matter, we are not satisfied that he should be held to answer for such excess over the real value. (*Christy v. McBride*, 1 Scam. 74.) And we find nothing in the record to impeach either the good faith or the judgment of the executor in the matter of improvements. We conclude then that the Court below very properly refused to deduct anything from this item.

It is next claimed that the executor has not accounted for all the money received by him as rent, and that he leased the property belonging to the estate for much less rent than could have been obtained. Upon these points also we find the testimony conflicting. Upon the charge that all the rents collected are not accounted for, the evidence is very strongly in favor of the executor. It is conceded that the rent agreed to be paid by Peiser, at first, was one hundred and fifty dollars, but Lovely, Vucovich, and Medin, testify that it was reduced to one hundred dollars per month, and their testimony is corroborated by the entries made at the time in the books kept by the executor. This Court cannot treat this testimony as unworthy of belief, when it preponderates over that against it, and the Court below credited and upon it settled the account. And accepting it as true, the amount returned by the executor for rents is correct, and so it should be settled.

Whether the executor rented the several buildings to the best advantage, and in this respect discharged his duty faithfully and

judiciously, are questions which it is always very difficult to determine, for it does not by any means follow that the property should have been leased to those who offered to pay the highest rent. That is not the only matter to be considered in securing a tenant. The purposes for which the property is to be used, the responsibility of the lessee, the length of time for which he may agree to lease, and many other circumstances of the kind, must necessarily be taken into consideration. That the executor was offered more rent than he received from those to whom he rented, is but little or no indication of mismanagement on his part. With all the circumstances to be considered in such a case, the mere proof that more rent was offered, or might have been obtained, is not sufficient to justify the conclusion of misconduct or bad faith on the part of the executor. Where so much must necessarily be left to the discretion of the executor, he should not be held to account, or his conduct impeached, except upon strong and satisfactory proof. Here, however, there is proof that the executor generally received and has accounted for as high rents as could have been obtained from responsible tenants. True, some witnesses testify that they offered more rent for the premises than was being paid, but the answer which one of them says was made him, may serve as an explanation why such offers may not have been accepted. The executor, he says, informed him that he preferred to rent the premises to the tenant then in possession, for less money than that offered, because he considered him a responsible man. The executor seems to have secured good tenants, and he may very properly have concluded that it was better for the estate to retain them than to rent to others of doubtful responsibility at higher rents. It is shown that the San Francisco Saloon was rented at six hundred dollars per month for the first three months after the appointment of the executor, but so it is also proven that it became necessary to reduce it, as the business would not warrant the payment of that amount.

If it were shown that the executor in bad faith, or injudiciously, rented the property of the estate for less than it should have brought, and what could with judicious management have been obtained, undoubtedly he should be held to account. But the evidence to establish it should be of the most satisfactory character. In this

case the evidence is conflicting, and on the whole we think there is sufficient testimony to uphold the conclusion attained by the Court below upon this item also.

It is claimed further by the heirs that the item for funeral expenses is extravagantly high.. It certainly appears exorbitant, amounting in the aggregate to over thirteen hundred dollars. But every item making up this large aggregate is given by the executor, and his proofs establish beyond doubt that he paid out the full amount charged. And the evidence on·behalf of the contestants does not show the amount thus paid to be unusual or extravagant. It is not claimed that the executor should not have sent the body to California for burial, but it is claimed that the amount paid for doing it was more than should have been paid, and that the body could have been sent to its burial place by public conveyance, for about two hundred dollars less than the sum charged by the executor, as having been paid by him. But the evidence shows that the usual charges by private conveyances at that time for like services were fully as much as what is charged in this account, and this was the mode of conveyance employed by the executor. Should he have employed the cheaper mode ? and if so, should he be held to account for the surplus ? It seems if there were any good reason why the body of the testator should be taken to California for burial, upon the same reason it should be conveyed there in a decent and respectable manner. There was the same reason for employing a private conveyance in this case, as there is usually for employing a hearse instead of ·a common cart, which might be secured for much less money than the ordinary conveyance. The evidence certainly discloses no want of good faith in the executor in this matter, nor indeed anything that the most prudent and judicious man might not have done under like circumstances. With respect to funeral expenses, the Courts generally take into consideration all the circumstances of each case, and when executors have acted with ordinary prudence, they are not held personally liable. ·

So it may be said of the expenses of the last sickness. · They appear extravagant : the proof, however, abundantly shows that all the items, including the surgeon's bill, were no more than the usual charges for like services at that time. Such testimony is sufficient

to sustain the action of the executor in the payment of these expenses of the last sickness.

The next complaint made against the executor is, that he was interested in the purchase of the property in the San Francisco Saloon belonging to the estate. This is expressly prohibited by the statute; and if the Court were satisfied that it was so, it might have declared the sale absolutely void—if third parties would not be affected—and ordered all the profits made from the retail sale of the liquors to be paid to the estate; or if it were more beneficial to the estate, could have affirmed the sale. In such case, the interest of the estate is alone to govern the action of the Court. The sale should not be set aside if to do so would be in any wise prejudicial to the interests of the estate. Whether the executor was interested or not, it is perfectly evident from the testimony that the property was sold for its full market value, and the money received from it paid to the estate. Under such circumstances the Court should not arbitrarily set the sale aside, whether beneficial to the estate or not. However, that the executor was interested in the purchase is an assumption hardly warranted by the evidence. On the contrary, the persons who had the best opportunity of knowing—those to whom the sale was in fact made—testify that he was not; that he did not become interested in the saloon until after the appraisement and sale to Lovely and Vucovich. It is true, an executor or administrator subjects himself to suspicion when he acquires an interest in property belonging to the estate, even after sale to third parties—and hence, it should always be avoided; but there is nothing in the law to prohibit him from becoming interested after the estate has ceased to have an interest. The testimony in this case shows that Medin did not purchase from the estate and was not interested in that sale, but he acquired an interest after a sale for its full value to Lovely and Vucovich. An interest so acquired, although it may create the suspicion that he was interested in the first sale, is nevertheless not sufficient to authorize setting it aside. The Court ruled correctly, then, in refusing to disturb the sale.

Again: The contestants complain that proper diligence was not used to collect the debts due the estate. It is not, however, shown

that any solvent debt has been lost by the default of the executor. The attempt to do so proved abortive. As no value was placed upon these debts in the inventory, they must be considered desperate; and in such case the burden of proof is upon the contestants, when it is sought to make the executor liable for loss resulting from such cause.

In the case of *Rowan* v. *Kirkpatrick et als.*, (14 Ill. 12) where an attempt was made to hold the executor liable for uncollected debts, the Court used this language, which is pertinent here: "*Prima facie* his (the executor's) estate should not be held liable for any of the uncollected debts which were inventoried as desperate. Upon *clear* proof that any debt was lost through his carelessness or want of attention, his estate should undoubtedly be held responsible; but an administrator, who has acted in good faith in the collection of the debts due his intestate, and intended fully and fairly to discharge his duty in that respect, ought not—if his intentions have been decided by a reasonable judgment in the matter— be charged with the loss of debts which he has failed to collect. While care must be taken to guard against an abuse of their trusts, by administrators, Courts ought not to hold them personally liable upon slight grounds, lest suitable persons be deterred from undertaking these offices." An executor or administrator should certainly make all reasonable effort to collect the debts due the estate; but he should not involve it in litigation for claims which, in his judgment, could not be collected. If the debts be inventoried as desperate, he should not be held for any uncollected, unless it be shown that they were lost by his want of proper management or effort.

We do not wish to be understood as holding that no effort should be made to collect even desperate debts; on the contrary, the executor should make all reasonable exertion to collect them. If, however, no collections are made, the burden of proving that they might, by proper effort, have been collected, lies upon those who seek to make the executor or administrator liable for loss. In short, *prima facie*, all debts which are inventoried as desperate, or to which no value is attached, are to be treated as uncollectable— hence, it is incumbent upon those claiming that they were solvent

and collectable to establish that fact. In this case, as before stated, the contestants have not shown that any collectable debt has been lost by the fault of the executor. He should not, therefore, be held answerable.

So, too, it is claimed the executor had no authority to pay the assessment levied upon mining stocks belonging to the estate. It is admitted that the assessments were actually levied; that they were paid by the executor; that if not paid, the stocks would have been sold; and that the stock was worth more than the assessments levied at the time of payment.

Under the statute of this State the executor and administrator have the possession and control of both the real and personal property belonging to the estate, which it is incumbent upon them to manage under the direction of the Probate Court prudently and economically, always of course following the requirements or directions of the statute where any exist. The statute makes it his duty to care for and manage the estate. With the possession and full control of all the property of the estate in the executor or administrator, who is required to manage it with prudence and good faith, can it be said with any show of reason that he has not the right, and would not be justified by an order of the Probate Court to pay any legal claim against the property, which if not paid would result in its loss to the estate? Is it not the executor's or administrator's duty to pay all legal taxes levied upon the property of the estate, or will he be justified in permitting it to be sold to satisfy them? Why is it not equally his duty to pay such assessments upon mining stocks as may be legally levied, and the payment of which is necessary to preserve it from sale? To allow valuable stock to be sold for assessments less than its value, would certainly subject an executor to the charge of misconduct. It is perhaps not his duty, nor do we think he would be justified in holding stock which is subject to assessments beyond such time as will be necessary to obtain an order of Court respecting it. Property of this kind, which is only an expense to the estate, should certainly be disposed of in some way, unless it be quite evident that it would be for the interest of the estate to hold it. But in such case an executor would certainly subject himself to liability for all loss unless he acted under

13

the direction of the Court; for his primary duty, it would seem, is to obtain an order to sell such property. But an order of Court, ordering him to pay all assessments, is a sufficient protection to him. It is, undoubtedly, within the jurisdiction of the Probate Court to order such payments; and if the executor act in obedience to such order, it would surely be inequitable to charge him personally with payments so made, or refuse to allow them as just payments made for the estate. The Probate Court in this case ordered the executor to pay all assessments then due, or which might thereafter become payable on the stock. In accordance with this order a large sum of money was paid, and now it is claimed that his claim for the money so paid should not be allowed. Had he not acted under an order of Court we should be induced to think it should not be allowed, for payment of the amount of assessments here charged would, if not paid by order of Court, be unwarranted under the circumstances. Why the Probate Court should have made an order so general and sweeping is entirely inexplicable, unless that tribunal was imbued with the notion so prevalent among the people in general at that period, that mining stocks, no matter how unprofitable at the time, or how heavy the assessments upon them, were nevertheless not to be disposed of for any reasonable sum, because of the priceless value which it was supposed they were to possess in the immediate future. No matter how indiscreet, the order was made, the executor acted in accordance with it, and we see no just grounds upon which his estate can be chargeable with the money so paid.

But it is argued by counsel that no such order was ever made. The attorney who obtained it, however, testifies positively that it was, and that no assessments were paid until after it was made; that he saw the order among the papers of the Court after this difficulty between the contestants and the executor had occurred. It does not appear to have been entered at length on the minute-book of the Court, as required by section two hundred and eighty of the Probate Act; but such neglect on the part of the Clerk of the Court can in no wise affect the rights of the executor, nor render the order less effective as a protection to him. It was no fault of his that the order was not properly entered, and if it were in fact

made, (and upon the testimony we have no alternative but to believe that it was) that is sufficient for his protection. The order itself, it is true, was the best evidence, but not being able to find it among the records of the Courts, secondary evidence of its character should certainly be allowed in a case of this kind. The Court below received the evidence of the attorney who obtained the order upon that matter, and properly so.

As to the items embraced in the second account, it is only necessary to say that they have once been settled and allowed by the Court; and section three hundred and thirty-nine of the Probate Act makes such settlement final and conclusive unless reversed on appeal. The language of this section received the consideration of this Court in the case of *Lucich* v. *Medin*, (3 Nev. 93) where it was held that a decree of settlement closed all further investigation in the respect to all accounts allowed, except where some error or mistake appeared upon the record. There is nothing upon the record showing that any item of the second account was allowed by mistake, or that the Court committed any error in so allowing it. The decree settling it, it must therefore be accepted as conclusive of the legality and justice of every item in the account.

There is an item in the third account which we think was improperly allowed: that is, the claim of three hundred and seventy-five dollars allowed Aud & Beebe, for attorneys' fees. This charge was for service rendered in a controversy between the executors themselves—Medin opposing the qualification of Millatovich, his coëxecutor, who was afterwards admitted. The services rendered were for Millatovich.

In contests of this kind between executors, it is certainly not just or proper that the estate should be charged with the expense. It is true, a portion of this fee was previously paid and allowed by the Court, and this perhaps led Medin to believe that the balance would also be allowed; but, properly, he should have been held liable for the entire fee. That a portion of it has been paid, by the order of the Court, by the estate, is no reason why it should be charged with the balance. This item was, we think, improperly allowed, and must be stricken out.

We are unable to see the force of the objection that Medin is

In the Matter of the Estate of Marco Millenovich.

not a competent witness on his own behalf. He certainly does not come within the exceptions mentioned in section thirteen, (Stats. 1864–5, 77) as that section is interpreted by this Court in the case of *Roney* v. *Buckland*, (*ante*); nor does the case of *Wilcox* v. *Smith* (26 Barb. 37) bear out the position of counsel for contestants, for it will be seen by that case the code of procedure, which in New York, as in this State, allows parties, although interested, to testify, has no application to proceedings in the Surrogate Court; whilst in this State it is expressly declared that the mode of proceeding prescribed by the Practice Act shall be applicable to probate proceedings. (Probate Act, Sec. 295.) His own testimony is not of course sufficient to support any item of expenditure exceeding twenty dollars without a voucher, (Probate Act, Sec. 234) unless it be shown that vouchers were in fact taken, but were lost or destroyed, and no new vouchers could be obtained.

As to the matter of costs in the Court below, the contestants are certainly entitled to them. It appears that upon this contest the Court below deducted the sum of sixteen hundred and seventy dollars, the most, if not all, of which was properly deducted. To this extent the contestants prevailed in the lower Court, and are entitled to their costs. Section four hundred and forty-one of the Practice Act declares: "There shall be allowed to the prevailing party in any action in the Supreme Court, District Court, and Probate Court, his costs and necessary disbursements in the action or special proceeding, in the nature of an action." The section three hundred and eleven of the Practice Act in no wise conflicts with this section, for it only provides for the allowance of costs in cases *not otherwise provided for by law.*

The order of the Court below striking out the cost bill filed by the contestants was therefore erroneous and must be reversed. The item of three hundred and seventy-five dollars allowed Aud & Beebe must be stricken out, and the decree in this respect is ordered to be so modified; otherwise, it is affirmed; respondents to pay the costs of this appeal.

WHITMAN, J., did not participate in the foregoing decision.